UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARNE H. FREDLY,
HENG REN SILK ROAD INVESTMENTS LLC,
HENG REN INVESTMENTS LP,
derivatively on behalf of
SINO AGRO FOOD INC.

                    Plaintiffs,

     -against-

SINO AGRO FOOD INC.,
LEE YIP KUN SOLOMON,
TAN POAY TEIK,
CHEN BOR HANN,
LIM CHANG SOH,
YAP KOI MING,
NILS ERIK SANDBERG
OLIVIA LAI

                  Defendants,

     -and-

SINO AGRO FOOD INC.

                Nominal Defendant.

Case No. 1:19-cv-02680-JMF

**FIRST AMENDED
VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT
AND COMPLAINT FOR
SECURITIES LAW
VIOLATIONS**

Plaintiffs Arne H. Fredly, Heng Ren Silk Road Investments LLC, and Heng Ren Investments LP ("**Plaintiffs**"), by and through their undersigned attorneys, submit this Amended Verified Shareholder Derivative Complaint and Complaint for Securities Law Violations against Sino Agro Food, Inc. ("**SIAF**" or the "**Company**"), Lee Yip Kun Solomon ("**Defendant Lee**"), Tan Poay Teik ("**Defendant Teik**"), Chen Bor Hann ("**Defendant Hann**"), Lim Chang Soh ("**Defendant Soh**"), Yap Koi Ming ("**Defendant Ming**"), Nils Erik Sandberg ("**Defendant Sandberg**"), and Olivia Lai ("**Defendant Lai**")  (Defendants Lee, Teik, Hann, Soh, Ming, Sandberg, and Lai together as the "**Individual Defendants**"). Plaintiffs allege the following based upon information and belief, except as to those matters concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based on, among other things, the

investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This is a shareholder derivative action brought for the benefit of SIAF and its shareholders, who purchased or otherwise acquired the publicly traded securities of SIAF from December 2015 through March 28, 2019.  The Company's shares trade on the OTCQX stock market in the U.S. and also on the Oslo Stock Exchange Merkur Market ("Oslo Stock Exchange") until September 11. 2019, when its shares will be formally delisted.

2.      This action is brought seeking equitable relief and damages to remedy, inter alia, (i) violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, (ii) breaches of fiduciary duties by the Individual Defendants, including, inter alia, (a) the gross mismanagement of SIAF, (b) the misleading and false statements issued (or failed to be issued) to SIAF's Board, its shareholders, the investing public, and governmental regulators, (c) the unauthorized and constant issuance of new shares to pay debts and securing financing for third parties, diluting shareholder ownership, and (d) the intentional scheme to devalue SIAF and its shareholders' stake in Tri-way Industries Ltd. ("Triway"), a formerly wholly-owned subsidiary of SIAF, while at the same time methodically transferring value from SIAF to Triway. This action

seeks to remove the Individual Defendants who remain with the Company from their managerial and directorial positions due to the above.

3.      Finally, this action seeks the appointment of an independent receiver to (i) shed light on the downward spiral of the Company's value and help prevent any further mismanagement, breaches of fiduciary duties, violation of law, and diminution of value, (ii) to ensure the status quo and preservation of the Company, its businesses, and its assets, and (iii) to appoint a new management team to assume control of the Company's day-to-day operations and attempt to restore value to SIAF and its shareholders

4.      This action was ultimately commenced after the Company's Board failed to answer multiple formal demands by shareholders that asserted serious and legitimate concerns regarding, inter alia, the mismanagement of the Company, its financial health relative to certain loan and financing agreements and defaults, and the future value of equity ownership in SIAF and its valuable subsidiary Triway that was and continues to be actively diluted by the Individual Defendants.

5.      Furthermore, since late 2018, after the Company first received a default notice with regard to a commercial loan agreement the Company entered into, SIAF management suspiciously rejected a live quarterly conference call, and instead required pre-screened and pre-approved shareholder questions only. SIAF management stated prepared remarks to the edited questions and refused to directly discuss with shareholders of the Company the loan default and its significant and material consequences, and other acute issues that have led to SIAF being charged by the Oslo Stock Exchange on November 2, 2018 for failing to disclose to the market certain inside information about the Company's scheme to issue common shares as security for various loans, and ultimately the Oslo Stock Exchange's resolution announced on July 11, 2019

that stated SIAF "is not suitable for listing on Merkur Market due to repeated and gross violations of the Merkur Market rules" and will in effect be delisted as of September 11, 2019.

6.     Upon information and belief, the Individual Defendants' refusal to engage with shareholders and continuing gross mismanagement of the Company outlined herein, including the purposeful dilution of existing shareholders equity in the Company, has been an intentional and methodical scheme that has successfully transferred the bulk of SIAF's assets and value to third-party entities that the Individual Defendants have related interests in, including SIAF's formerly wholly-owned subsidiary Triway. This value transfer scheme was ultimately accomplished through a series of various loan, financing, and security agreements between SIAF, Triway, and other third parties, details of which were never properly disclosed to shareholders or the investing public at large.

7.     The Individual Defendants have been able to accomplish this scheme, and have not had to face any consequences thus far for their wrongful conduct, due in large part to the Individual Defendants' absolute power and super majority control over the Company, as well as Defendant Lee's current roles as Chairman of the Board, CEO, President, and CFO – as well as the Chairman and Managing Director of Triway. This action was commenced to finally hold the Individual Defendants accountable for their wrongful and illegal conduct.

## **PARTIES**

8.     Plaintiff Arne H. Fredly is a citizen of Norway and an individual residing in Monaco. Mr. Fredly has at all material times of this action been a shareholder of SIAF.

9.     Plaintiff Heng Ren Silk Road Investments LLC is a limited liability corporation incorporated under the laws of the Cayman Islands.  Heng Ren Silk Road Investments LLC is currently and has at all material times of this action been a shareholder of SIAF.

10.    Plaintiff Heng Ren Investments LP is a limited partnership incorporated under the laws of the Commonwealth of Massachusetts, U.S.A.  Heng Ren Investments LP is currently and has at all material times of this action been a shareholder of SIAF.

11.    Nominal Defendant SIAF is a Nevada corporation with its principal executive offices located in China.  SIAF has operational offices in multiple countries including the U.S. SIAF securities trade on the OTC QX market, and the Company reports to the SEC.  SIAF transacts significant business in the State of New York, and the Company's corporate legal counsel is located in the City and State of New York.

12.    Defendant Lee is the current Chairman of the Board of Directors of SIAF as well as the President, CEO, and CFO of the Company.  Upon information and belief, Defendant Lee is an Australian citizen.

13.    Defendant Teik is a current Director of SIAF with managerial and executive influence and power.  Upon information and belief, Defendant Teik is a Malaysian citizen.

14.    Defendant Hann is a current Director of SIAF with managerial and executive influence and power.  Upon information and belief, Defendant Hann is a Taiwanese citizen.

15.    Defendant Soh is a current Director of SIAF with managerial and executive influence and power.  Upon information and belief, Defendant Soh is a Malaysian citizen.

16.    Defendant Ming is a former Director of SIAF who had managerial and executive influence and power. Upon information and belief, Defendant Ming is a citizen of Malaysia and, upon information and belief, a resident of Australia.

17.     Defendant Sandberg is a former Director of SIAF who had managerial and executive influence and power. Upon information and belief, Defendant Sandberg is a citizen of and resident of Sweden.

18.     Defendant Lai is a former CFO of SIAF who had managerial and executive influence and power. Defendant Lai is a citizen of Hong Kong.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1332 because the parties are citizens of different states and foreign countries and the amount of controversy exceeds $75,000.00.  Furthermore, this Court has subject matter jurisdiction pursuant to 28 U.S.C 1331 because Plaintiffs have alleged violations of federal law.  As a result, pursuant to 28 § U.S.C. 1367, this Court also has supplemental jurisdiction over state law claims alleged herein.

20.     This Court has jurisdiction over each Defendant named herein because SIAF is a corporation that conducts and transacts business in this District, and otherwise has sufficient minimum contacts with the U.S. and this District.  The Individual Defendants through SIAF as well as individually also have sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Furthermore, this Court has jurisdiction over each Defendant based on FRCP 4(k)(1) and CPLR 302, due to the Individual Defendants' contacts with this District via SIAF and individually.  Moreover, this Court has jurisdiction over all Defendants pursuant to FRCP 4(k)(1)(c) and Section 27 of the Exchange Act (15 U.S.C § 78aa) due to the Exchange Act violations alleged herein.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because each of the Defendants are subject to personal jurisdiction of this District with respect to this action.

22.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

FACTUAL ALLEGATIONS

**Share Purchases and Prices**

23.    Mr. Fredly's purchases of SIAF shares spanned the period from December 2015 through January 2016.

24.    Heng Ren Investments LP's purchases of SIAF shares occurred throughout October 2018.

25.    Heng Ren Silk Road Investments LLC's purchases of SIAF shares spanned the period from February 2019 through March 2019.

26.    In January 2016, the share price of SIAF was approximately $9.00 per share in the OTCQX stock market in the U.S. On August 13, 2019, the share price was approximately $0.15 per share.

27.    In the Olso Stock Exchange, the price of the SIAF stock was NOK 92-93 (approximately $10) per share. The most recent price available is NOK 3 (approximately $0.40).

28.    These precipitous falls in prices are due to and proximately caused by the market's gradual realization that the Company, for the reasons discussed herein, was a house of cards built on material, repeated and persistent misrepresentations and omissions in its securities

filings. As a result of Defendants' wrongful acts and omissions alleged herein, and the precipitous decline in the market value of the Company's securities, Plaintiffs have suffered significant losses and damages.

**SIAF Background**

29.     SIAF, a Nevada corporation, is an agriculture technology and natural food holding company with principal operations in the China.  The Company acquires and maintains equity stakes in a portfolio of joint venture businesses that SIAF forms according to its core mission to produce, distribute, market and sell natural, sustainable protein food and produce, primarily seafood and beef, to the rapidly growing middle class in China.

30.     The Company's corporate structure including its control and ownership over various subsidiaries is as follows:



31.     The Company has two classes of shares, Series A Preferred Shares and Common Shares. The common shares have been listed in the United States since January 2012 on the OTCQB U.S. Premier market. The common shares were also admitted to trading on the Oslo Stock Exchange in January 2016, but will be ultimately delisted from the Merkur Market on September 11, 2019.

32.     The Individual Defendants, through the creation of Series A-share issuances, have absolute power and super majority control over the Company. Defendant Lee, with just an 8.38% equity ownership interest in the Company, has an incredible super majority voting right interest by himself, with 61.67% of the Company's voting rights.  Defendant Lee, as Chairman and with such super majority voting power, cannot be outvoted and thus cannot be ousted from his positions.  The officers and directors of the Company (including Defendant Lee) have a 12.67% equity ownership interest in the Company, but have 82.17% of the Company's voting rights.

33.     Such absolute and unchecked power and unbridled control over the Company has shielded the Individual Defendants thus far from any consequences of their continued wrongful conduct, breaches of fiduciary duties, and violations of securities laws as outlined herein.

**Misstatements and Untimely Disclosure of Information on Share Issuance**

SIAF Started to Issue Collateral Shares to Guarantee Various Loans

34.     Starting in 2015, the Company guaranteed loans of various third parties and issued SIAF shares as collateral for those loans.

35.     For example, on September 2, 2015 the Company entered into a loan and pledge agreement ("Trade Facility").

36.     The borrower was one of SIAF's clients, which is an import/export trading house in Shanghai and for which SIAF acted as "Security provider."

37.     The loan had a face value of $26,666,666, which was secured by up to 1,600,000 SIAF shares at $12.50 per share.

38.     By February 22, 2016, 1,600,000 basic collateral shares had been issued.

39.     However, as the share price of SIAF dropped the Company had to issue "Top-up" collateral shares to the Lender to maintain the value of the security for the loan.

40.     Therefore, between June 17, 2016 and September 30, 2017, 4,108,312 top-up shares were issued, making a total of 5,708,312 collateral shares issued as a result of the Trade Facility.

41.     The Company falsely claims the issuance of these shares did not have an adverse impact on other investors because the lender holding these collateralized shares cannot sell these shares in the market and they do not have any dividend or voting rights. However, these shares are not put in an escrow account or earmarked in any way, and may be sold by the lender in the market immediately, as determined by the Oslo Stock Exchange.

42.     If the shares are sold and purchased in the market, then the purchasers would be entitled to dividend and voting rights.

43.     If the shares were not sold by the lender, this entity would have been a significant shareholder with more than 5% of the share capital and that should have been disclosed to the market, which did not happen.

44.     Upon information and belief, one of the reasons the share priced dropped so rapidly was due to the lender dumping the collateralized shares on the open market.

<u>The Loan Guarantees Had a Dilutive Effect on the Investors</u>

45.     On December 27, 2016, the Company issued 1,270,000 collateral shares for loans of about USD 10 million to Triway. SIAF was "security provider".

46.     As the share price dropped, the Company issued 892,775 Top-up shares on June 30, 2017 and further 500,000 Top-up shares on September 30, 2017.

47.     From YE 2014 until YE 2017, the number of collateral shares, including Top-up shares, increased from 0 to 8,445,435. By YE 2017 collateral shares including Top-up shares amounted to 29 % of all outstanding shares.

48.     In other words, the Trade Facility and the Triway Loans (discussed infra) have diluted and destroyed shareholders' values significantly, while promoting business opportunities primarily for the SIAF client, consultants, and Triway, not the shareholders.

49.     Given the potentially significant effect of the issuance of the collateral shares and top-up shares, SIAF failed to provide the investors with timely and adequate information related to the Trade Facility and the Triway Loans.

<u>The Company Failed to Timely and Accurately Disclose Issuance of Collateralized Shares and Provide Sufficient Information on Trade Facility and Triway Loans</u>

50.     As discussed above, additional top-up shares were issued to the lenders when the share price of the Company dropped. For example, the Company issued 365,000 additional shares related to the Trade Facility on February 22, 2016. However, this was not reported in an 8-K filing or other filing to the SEC. In addition, in the first 2016 10-Q, SIAF falsely reported only the 1,235,000 collateralized shares and failed to include the additional shares.

51.     Again on June 17, 2016, the Company issued 533,333 collateralized shares for the Trade Facility. This was not reported in an 8-K filing. In addition, this issuance was neither timely disclosed in the second quarter 10-Q report of 2016 to the SEC nor to the Oslo Stock Exchange.

52.     On November 16, 2016, the Company reported in its 10-Q that it issued 1,191,537 shares as collateral to secure a $8.25-million loan from a third-party lender. However, as the Oslo Stock Exchange pointed out, the correct number of collateralized shares for the Trade Facility on that date was 2,133,333 shares.  In other words,  SIAF's filing understated the number of collateralized shares by almost 1,000,000 shares.

53.     As mentioned, on December 27, 2016, the Company issued 1.27 million collateralized shares for the Triway Loans. However, this was not reported in an 8-K to the SEC. Nor was this timely disclosed to the SEC in the 2016 10-K nor to the Oslo Stock Exchange.

54.     On July 19, 2017, the Company issued 1,690,699 shares for a Trade Facility. This was not reported on an 8-K to the SEC.  Nor was this issuance timely disclosed in the Third Quarterly report of 2017 to the SEC.

55.     Similarly, on September 30, 2017, the Company issued 191,547 collateralized shares to secure additional loans, and this was also not disclosed in either an 8-K filing or the Third Quarter report to the SEC.

56.     The first time the Company even pretended to try to make a serious disclosure effort regarding its practice of issuing shares to secure its loan was in the 2017 Second Quarter report, filed on August 14, 2017.  In that report, the Company totaled the  number of Collateralized Shares issued under each loan as of December 31, 2016 and the number of additional Collateralized Shares issued during Q2 2016. For the first time, the Company also explained why there have been additional issuances of Collateralized Shares, this being a result of a decrease in the Company's share price requiring the Company to issue additional Common Shares or "top up" shares as security.

57.    But that report failed to give adequate information. The information was buried in one of the notes to the financial statements and is included on page 71 of a financial report of 104 pages. The notes refer to four loans, but does not provide information as to when each loan was entered into, which makes it difficult for the reader to identify each loan and the number of Collateralized Shares issued under these compared to the information about the Trade Facility in the Admission Document to list SIAF shares for trading on the Oslo Stock Exchange. An investor reading this document cannot properly understand the context and whether the information is historical or still of relevance.

58.    Nor can the 10-Ks for 2016 and 2017 provide sufficient information. These two filings provide the same general information about the loans and failed to alert a reasonable investor of the Company's persistent practice of issuing additional shares to secure third-party loans, which had a strong dilutive impact on its investors. Moreover, the disclosures were also buried in lengthy filings and failed to acknowledge its earlier omissions.

59.    Additionally, in 2018, the Oslo Stock Exchange indicated that the Company had issued 5,524,255 shares for collateral, payment and staff incentives by February 5, 2018. However, this information was not made available in a timely manner to the shareholders in the first 10-Q of 2018.

<u>Failure to Disclose Issuance of Shares to Employees and Consultants</u>

60.    The Company has relied upon share printing as payment towards service providers, suppliers, lenders, debtors, staff, management and consultants. During the single year of 2018 it escalated to 17.3 million of shares printed towards debtors/contractors and 3.2 million of shares were printed towards staff and consultants. The total of number of shares issued in that single year was 20.5 million, which resulted in an increase of 69.9% to 49.9 million shares.

61.     These shares had serious dilutive effects. But they were not disclosed in a timely manner in any 8-K filings.

Failure to Disclose Violation under the Oslo Stock Exchange

62.     On January 13, 2016, SIAF was admitted to the Merkur Market under the Oslo Stock Exchange.

63.     On January 19, 2018, the Oslo Stock Exchange requested information from the Company regarding its practice of issuing additional Common Shares as security and whether proper disclosure had been made. The Company and the Oslo Stock Exchange then had a series of back-and-forth communications regarding the concerns raised in the January 19, 2018 inquiry.

64.     On November 2, 2018, the Oslo Stock Exchange imposed a violation fine on SIAF of approximately $80,000 due to SIAF's failure to disclose arrangements to issue common shares as security for various loans and trade finance facilities which were "gross violations" of certain requirements to trade on the Oslo Stock Exchange.

65.     Specifically, the Oslo Stock Exchange deemed the "Company's obligations to issue Common Shares as security for the Trade Facility and Additional Loans" as "inside information which has not been disclosed timely to the market in accordance with section 3.1.1 of the Continuing Obligations."

66.     Subsequently, on July 11, 2019, the Oslo Stock Exchange resolved to delist SIAF from the Merkur Market.

67.     None of the above was disclosed in any of the SEC filings, let alone the untimely disclosure of the issuance of those shares to the SEC, or a reasonable explanation to investors as to whether the shares were truly "restricted."

68.     Moreover, in a news release dated February 28, 2019, the Company announced that it was applying to be delisted from the Oslo Stock Exchange without giving the background of the disciplinary process to which the Company was subject.  This news release created the false impression that the choice to delist was a pure business judgment taken without the coercive force of an official investigation or a final finding of violations.

<u>Failure to Disclose Sanctions by the Public Company Accounting Oversight Board</u>

69.     Between 2007 and June 2013, Madsen & Associates CPAs, Inc. ("Madsen") served as the Company's auditor.

70.     On January 15, 2015, the Public Company Accounting Oversight Board ("PCAOB") issued a disciplinary order banning Madsen and its principal for two years for failures to comply with PCAOB rules and auditing standards in connection with the audit of the financial statements of SIAF for the year ended 2011.

71.     Specifically, PCAOB concluded that Madsen possibly manipulated SIAF's 2011 revenue for failure to disclose related party transactions and accurately assess Company management's percentage-of-completion calculations under a long-term contract. According to PCAOB, Madsen failed to properly address potential red flags regarding revenue overstatement.

72.     Between June 2013 and January 2016, Anthony Kam & Associates Limited ("Kam") served as the Company's auditor.

73.     On November 28, 2017, the PCAOB similarly issued a disciplinary order banning Kam for five years for failure to assess and recognize fraud risks in relation to SIAF's income from long-term development contracts related to fishery, prawn, beef farms, and catering facilities and restaurants. The PCAOB order stated: "For both the 2013 and 2014 (Kam &

Associates) failed to perform audit procedures to specifically address the risk of management override of controls."

74.    In both cases, PCAOB specifically casted doubt on possible fraud committed by the Company due to material misstatement and mismanagement.

75.    Even though these disciplinary orders directly put the Company's integrity of its financial reporting into doubt, and presented a material risk to investors and shareholders, the Company neither disclosed these orders nor provided sufficient information for them to gain constructive knowledge.

<u>Misleading Statement about Dividends</u>

76.    In its Form 10-Q filed May 14, 2018, the Company reported that, under advisement of its Board, it had decided to issue a cash dividend in Fiscal Years 2018 and 2019. The announcement was issued in unqualified language and was not subject to contingency. Plaintiffs reasonably took the announcement as a promise by the Company of dividend payments.

**Triway Background**

77.    Triway is a Hong Kong holding company, which in turn 100% owns Jiangmen City A. Power Fishery Development Co Ltd ("JFD"), a China holding company.  In its SEC filings and investor materials, SIAF represented that JFD was the 100% owner of five "Aqua Farms" that produced certain fish and other seafood within China. The ownership structure according to SIAF in its SEC filings was as follows:



78.     Up until March 2017, however, Triway was a wholly-owned entity of SIAF, owning and operating a few aquaculture assets. SIAF provided full financing and security for Triway's operations and debt, and it was in theory to receive 100% of the revenue and benefits from Triway.

79.     In December 2016, SIAF resolved to issue common shares in SIAF as security for debt of approximately $10 million incurred by Triway, pursuant to four promissory notes (the "Triway Loans") between Triway and a third-party lender.

80.     Pursuant to the Triway Loans, on December 27, 2016 the Company issued an initial 1,270,180 common shares as collateral for the loan value. This initial share issuance as security was not disclosed to the Oslo Stock Exchange until March 2017.

**Triway Carve-Out**

81.     As of October 5, 2016, Triway was the sole owner, developer and operator of all fishery projects and Aqua Farms under Triway

82.     In March 2017, however, the Company announced that it had completed a carve-out of Triway, which saw the Company's ownership of Triway reduced from 100% to 36.6%. The reasoning behind the carveout was that Triway would be coming out ahead, ownership reduction notwithstanding, due to the additional assets that were pledged to Triway from various Chinese investors and owners.

83.     On April 22, 2017, SIAF published a document titled "Aquaculture Carve Out Q&A," which asserted that the enterprise value of Triway was $340.6 million and that its value resulted from Aqua Farms 1-5.

84.     However, in the SAIC filing, SIAF asserted the total asset of the five Aqua Farms being a mere $12.3 million. Realistically, it is highly improbable that the enterprise value could be an astronomically high 27.7 times more than the assets are worth.

85.     Indeed, shareholders and Plaintiffs now have reason to believe that the carveout was never intended to benefit SIAF, but instead was undertaken in order to reduce SIAF's ownership interest in Triway to the benefit of the new owners in Triway, whom it is believed that the Individual Defendants have personal relationships and/or indirect ownership of Triway themselves.

**Top-Up Shares for Triway Loans**

86.     Meanwhile, even though SIAF's ownership interest in Triway had been reduced to 36.6%, SIAF was continuing to provide 100% of the financing and security for Triway's operations and debt, and continued to issue shares of the Company as additional security for Triway Loans, which was further dilluting SIAF shareholders equity interest in the Company and in Triway.

87.    The Company issued an additional 892,735 shares on June 30, 2017 and 500,000 shares on September 30, 2017 to the third-party lender as additional security for the loan value under the Triway Loans.

88.    These subsequent issuances post carve-out were never disclosed to the Oslo Stock Exchange. The total number of collaterlized shares and top-up shares for the Triway Loans is 2,666,735.

89.    Disturbingly, SIAF has never been provided any consideration by Triway or the other Triway owners for SIAF's continual issuance of shares as security for Triway's loans.

90.    Moreover, under the terms of the Triway Loans, which are interest free, the collateralized shares are not to carry any dividend or voting rights. However, the Company has also stated that the collaterlized shares are not placed in any escrow account or otherwise subject to any lock-up agreement.

**Past Due Amounts Owed to SIAF from Triway**

91.    In addition to the interest-free security provided by SIAF to secure the Triway Loans, SIAF has also failed to collect past-due receivables from Triway, and these receivables do not appear to have any fixed rate of repayment or interest attached thereto.

92.    Upon information and belief, revenue from Triway accounted for 7.9% of SIAF's 2018 total revenue and 8.6% in 2017.

93.    Upon information and belief, however, accounts receivable from Triway accounted for ~59% of total receivables in both 2017 and 2018, and this percentage increased to 61% as of March 2019.

94.    Included in accounts receivable due from Triway is $60,799,365 and $49,065,385 as of December 31, 2018 and December 31, 2017, respectively.

95.    There does not appear to be any settlement dates for these receivables, and thus it appears that SIAF is providing interest-free loans to Triway with no fixed term of repayment. This is yet another example of how the Individual Defendants, led by Defendant Lee, have favored Triway to the detriment of SIAF and its shareholders.

**Conflicts of Interest Regarding Triway**

96.    Triway was intended to be a stand alone, listed company with its own board of directors and management.

97.    Instead, Triway is now maintained as an unconsolidated investee of SIAF, with Defendant Lee acting as Triway's Chairman and Managing Director.

98.    Furthermore, upon information and belief, Defendant Lee also has either direct or indirect ownership of Triway separate from SIAF.

99.    Demands to the SIAF Board by shareholders have gone unanswered regarding additional detailed disclosure about the Triway carveout, including not only financial information supporting the valuation of all assets that were contributed to Triway in exchange for ownership interest, but also details on the new owners and any potential conflicts of interest.

100.    The full ownership of Triway is not public or known, and Plaintiffs believe that upon being granted discovery in this action, it will be shown that the Individual Defendants have either direct or indirect ownership interests in Triway.

**Misleading and False Statements Regarding Triway and Aqua Farms**

101.    Not only did the carve-out siphon off SIAF's ownership in Triway for what appears to be no real consideration at all, but the Company has issued various filings and public statements with misleading and/or false information regarding Triway and the Aqua Farms.

102.     In its SEC filings and investor materials, SIAF represented that it could

have the option of owning the Aqua Farms.

103.     Specifically, SIAF represented that "the Company works with Chinese

investors to form operating companies, in which the Company retains the option to acquire

equity interest. After a certain period of time and successful operating results, the Company and

the Chinese investor may form a Sino Foreign Joint Venture Company ('SFJVC'). Prior to the

formal naming, registration, and incorporation of an anticipated SFJVC, the Company prepays a

deposit toward the consideration of its future SFJVC stake as a percentage of the assets of the

fully developed farm. Upon conversion, the prepayments become equity capital."

104.     Furthermore, SIAF's SEC Form S-1, dated on June 27, 2019, states as

follows:

> As of March 31, 2018, the percentages of equity stakes of A (trade and seafood
> centers), B (fish farm 2 GaoQiqiang Aquaculture Farm) and C (cattle farm 2) are
> 31%, 23% and 35% respectively.
>
> As of December 31 2014, the percentages of equity stakes of SFJVCs A (trade
> and seafood centers), B (fish farm 2 Gao Qiqiang Aquaculture Farm), C (prawn
> farm 1), D (prawn farm 2) and E (cattle farm 2) are 31%, 23%, 56%, 29% and
> 35% respectively.

105.     However, investigation into certain filings by SIAF to the State

Administration for Industry and Commerce ("SAIC") in China reveals that the true owners of

Aqua Farm 2 is an unknown individual by the name of Gao Zuanming, who, upon information

and belief, has no connection to entities referenced in the above chart - JFD, Triway, or SIAF.

106.     This means that Aqua Farm 2 is not a Sino-Foreign Joint Venture

Company ("SFJVC") as represented in the SEC filing above, and thus the Company cannot

acquire equity in Aqua Farm 2 as indicated in the SEC filings.

107.    Similarly, SAIC filings show that the owners of Wholesale Center 1, a marketing, distribution, seafood processing and sales complex, are unknown individuals Zhou Jianfeng (51% ownership interest) and Zhou Haiyan (49% ownership interest).

108.    Upon information and belief, neither Zhou Jianfeng nor Zhou Haiyan is affiliated or connected to JFD, Triway, or SIAF, and thus, the ownership structure is other than an SFJVC. This means that the Company cannot acquire equity in Wholesale Center 1 as indicated in the SEC filings.

109.    Moreover, SAIC filings reveal material inconsistencies among revenue reported to the SAIC in China, revenue reported to the SEC, and in Press Releases to U.S. shareholders and investors in the same time periods. For example, in 2017, SIAF reported that the five Aqua Farms generated $447,080 in revenue in the annual report filed with the SAIC. However, in its 2017 10K, SIAF reported to the SEC nearly $17 million in revenue generated by the consulting services by Capital Award Inc. ("CAI"), which supposedly provided technology services to Triway to support the operation of the farms.

110.    The stark difference between the revenue reported to the SAIC and the "consulting services" revenue puts the accuracy and veracity of the numbers reported to the SEC into question, as it appears improbable for a company with a supporting role in the business, such as CAI, to generate revenue as many as forty times more than the actual business, Triway.

111.    SIAF also reported in its Press Release a contribution of $12 million from Triway  to SIAF's income (based on TRW's total income of $32.8 million and SIAF's 36.6% ownership). In contrast, in its 2017 10-K SEC filing, SIAF reported that Triway  was disposed from the Company in October 2016 and therefore generated no income in 2017.

112.    Similarly, in 2017, SIAF reported that the total asset value for Triway's Aqua Farms 1-5 was approximately $310 million, based on an "independent appraisal" allegedly performed by The Dun and Bradstreet Corporation.  In reports to China's SAIC, however, it was reported that in 2017 the total asset value of Triway's Aqua Farms 1-5 was $12.3 million.

113.    In an October 5, 2018 press release, SIAF stated that Triway was pleased to announce a share distribution to SIAF and its shareholders on November 14, 2018 at a reportable value of $1.33 per share.  In the December remarks, SIAF management stated Triway's share dividend would require an F-1 filing to the SEC, which they represented as "near completion to submit." To date, it has still not been filed.

114.    Despite the massive loan default, the recent Oslo Stock Exchange violations, fine, and delisting, and the impending U.S. delisting to "go dark," SIAF has dangled to investors the prospect of a 2020 IPO for Triway on the Stock Exchange of Hong Kong (HKEX).  According to SIAF's 2017 10-K filed with the SEC, "A team of qualified HK licensed CPA's, securities attorneys, and Tri-way staff continue to organize and compile all Tri-way financial and legal records, past and present, throughout the pre-IPO process in accordance with its application to the exchange and regulatory authorities in concert with its financial advisors providing guidance throughout the pre-IPO process."

**Various Other Breaches Due to Mismanagement**

115.    Because of their positions as officers and/or directors of the Company and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed SIAF the fiduciary obligations of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were required to act in the best

interests of the Company so as to benefit the Company, and not in furtherance of their personal interests or benefit. The Individual Defendants, because of their positions of control and authority as directors and/or officers of SIAF, were able to directly and/or indirectly, exercise control over the wrongful acts complained of herein.

116.    The Individual Defendants have breached their fiduciary duties by failing to take the necessary steps to appoint certain directorial and managerial positions of the Company, leaving such positions either vacant, or allowing Defendant Lee to assume such unchecked executive functions as SIAF's Chairman of the Board, President, CEO, and CFO while enjoying supermajority control of shareholder votes due to his A-shares. The unfilled vacancies included the Company's critically important CFO position, which has been vacant since December, 2018. Upon information and belief, Defendant Lee has self-appointed himself as CFO.

117.    The Individual Defendants have breached their fiduciary duties in relation to a default on the note originally issued by Euro China Capital AB ("ECAB") in the principal amount of $33,300,000.00.  The notice of default for the new note was received by the Company on December 12, 2018 and specified that SIAF was in default due to, inter alia, failure to make repayments on the note as prescribed by its terms. Based upon information and belief, the Defendants have taken no material steps to ameliorate this default. Despite generating over $20 million in cash flow from operations in 2018, SIAF still defaulted on its debt payment under this note.

118.    The Individual Defendants have breached their fiduciary duties by directing and/or allowing SIAF to abandon certain of its essential business lines, engaging in gross mismanagement and wasting corporate assets.  The Defendants have seemingly and

inexplicably abandoned their cattle and meat trading business that was previously touted as a highly successful diversification of the Company with a potential IPO through the Company's Macau EIJI Company Ltd ("MEIJI") subsidiary. Upon information and belief, this business line was abandoned because it did not fit into the Individual Defendants' scheme to transfer value out of the SIAF parent company and into Triway or other third-party entities that the Individual Defendants had a related interest in.

119.    The Individual Defendants further breached their fiduciary duties by, upon information and belief, issuing new shares on multiple occasions in violation of certain anti-dilution clauses by which the Company was bound. The continual issuance of common shares as collateral was a further violation since it failed to put the best interest of the Company first and instead simply diluted shareholders equity in both SIAF and Triway. While the number of outstanding shares increased by 36 million from 13.9 million at the beginning of 2014 to 49.9 million at the close of 2018, which increased the book value of equity by $77.1 million, SIAF did not receive any cash proceeds during the five-year period based on the cash flow statement. According to the disclosure in the 2018 10-K, 20.2 million shares were issued to pay various debtors, 6.6 million shares to pay staff and consultants, 8.4 million shares as collateral for borrowings, and 0.7 million shares to settle convertible securities – many without disclosure to the SEC. The relatively enormous number of shares issued – an increase of 36 million to a total of 49.9 million shares – without receiving any cash, has destroyed the value of the Company and damaged shareholders.

120.    The Individual Defendants breached their fiduciary duties by failing to include in certain recent filings and public statements the required cautionary statements identifying important and meaningful factors that could cause the actual results to differ

materially from those in their forward-looking statements.  By failing to include the cautionary disclaimers, the Individual Defendants disqualified the Company from claiming Safe Harbor protections and put the Company at risk of securities fraud.

**Derivative Allegations and Demands to the Board**

121.    Plaintiffs bring this action derivatively in the right and for the benefit of SIAF to redress the wrongful and illegal conduct outlined herein by the Individual Defendants.

122.    Plaintiffs will adequately represent the interests of SIAF and its shareholders in enforcing and prosecuting its rights.

123.    SIAF is named as a nominal defendant in this action solely in a derivative capacity.  This is not a collusive attempt to confer jurisdiction on this Court that it would not otherwise have.  Prosecution of this action, independent of the Individual Defendants, is in the best interests of SIAF and its shareholders.

124.    Several detailed demand letters were sent to the Board explaining SIAF's shareholders' views that the Company was being mismanaged, that certain Directors were committing breaches of their fiduciary duties, and that the Company and its Directors were likely in violation of certain state and federal laws due to mismanagement and public misstatements and/or omissions as detailed herein. The demands asked the Board respond to the letters and take certain desired remedial actions. The first detailed demand letter was sent to the Board in November 2017 and the second in January 2018. The Board refused to answer the shareholder letters and further refused to take any action as demanded.

125.    Notwithstanding the above demands, Plaintiffs also submit that those demands and any other such demand by Plaintiffs to the SIAF Board of Directors would be futile due to a majority of the Directors being interested in the alleged violations of law contained

herein.  Indeed, Defendant Lee's absolute voting power over the Company (61.67% voting rights) and the Directors' combined 82.17% voting rights of the Company make any such demands to the Board futile.

## FIRST CAUSE OF ACTION
### (Appointment of a Receiver)
### (As to Nominal Defendant SIAF)

126.    Plaintiffs repeat and reallege each of the foregoing allegations as if more fully set forth at length herein.

127.    Due to the wrongful conduct herein, which includes, inter alia, the abandonment of business lines and operations, failure to cure a massive loan default, failure to cure financial reporting leading to sanctions for violations by the Norway regulators, failure to be transparent with financial details of the Company, failure to properly manage the Company in many material ways, and the violations of federal securities laws, an independent receiver is necessary and prudent to (a) ensure the company assets are preserved; (b) prevent the further dissipation of the Company and its assets; (c) secure the current true financial condition of the company; (d) take the necessary steps to ensure the Individual Defendants who remain are removed from the Company; and (e) appoint a new management team to run the Company's day-to-day operations in line with proper corporate governance, company by-laws, articles of incorporation and rules of the SEC and restore value to the Company and its shareholders.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duties)
### (As to the Individual Defendants)

128.    Plaintiffs repeat and reallege each of the foregoing allegations as if more fully set forth at length herein.

129.    As outlined herein, the Individual Defendants, due to their positions and control over SIAF, owed and continue to owe SIAF, the Board, and the shareholders certain fiduciary obligations.

130.    The Individual Defendants breached their fiduciary obligations in that the Individual Defendants:

a.    failed to disseminate accurate and truthful information to the Company, its shareholders, the investing public, and certain governmental regulatory bodies; and

b.    failed to prudently manage the Company in a way that put the best interests of the Company first, including by (i) abandoning certain business lines of the Company, (ii) allowing certain managerial roles to be left vacant, and by allowing Defendant Lee to de facto take over such vacant positions, (iii) allowing the Company to default on a promissory note issued by ECAB, (iv) by failing to include in certain recent filings and public statements the required meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in their forward-looking statements, (v) intentionally diluting SIAF shareholder's equity in the Company by continually issuing shares as payments, debt, financing and security for third-party entities, (vi) intentionally diluting SIAF's ownership interest in Triway and agreeing to a carveout that saw SIAF reduce its ownership from 100% to 36.6% in a sham deal , and (vii) continuing to provide 100% financing to Triway even though SIAF no longer wholly owned Triway and without SIAF receiving any consideration for the various loans and security provided.

131.    Due to the Individual Defendants' breaches, SIAF has been substantially harmed.

## THIRD CAUSE OF ACTION

**(Violation of Section 10(b) of The Exchange Act and Rule 10b-5)**
**(As to All Defendants)**

132.    Plaintiffs repeat and reallege each of the foregoing allegations as if more fully set forth at length herein.

133.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

134.    The Company and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities.

136.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated,

29

or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

137.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive the Plaintiffs, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs. Furthermore, the Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described herein.

138.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of SIAF, the Individual Defendants had knowledge of the details of SIAF's internal affairs.

139.    As a result of the foregoing, the market price of the Company's securities was artificially inflated. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs relied on the statements described above and the integrity of the market price of the Company's securities in purchasing the Company's securities at prices

that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

140.    Had Plaintiffs been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

141.    As a result of the wrongful conduct alleged herein, Plaintiffs have suffered damages in an amount to be established at trial.

142.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs for substantial damages which they suffered in connection with their purchases of the Company's securities.

## FOURTH CAUSE OF ACTION

### (Violation of Section 20(a) of The Exchange Act)
### (As to the Individual Defendants)

143.    Plaintiffs repeat and reallege each of the foregoing allegations as if more fully set forth at length herein.

144.    The Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information regarding the Company's business practices.

145.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

146.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace, and exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

147.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations in this Amended Complaint.

148.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand that judgment be entered as follows:

(a) **on the first cause of action (appointing a receiver)**, judgment against Defendant SIAF, for the following relief:

     i.    appointing an independent receiver to assume full control over the Company, its assets, and employees;

    ii.    for attorneys' fees and all costs; and

    iii.    for such other and further as this Court may deem equitable and just.

**(b)** **on the second cause of action (breach of fiduciary duties)**, judgment against the Individual Defendants, jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

    iii.    punitive damages in an amount to be determined at trial;

    iv.    attorneys' fees and all costs; and

    v.    such other and further relief as this Court may deem equitable and just.

**(c)** **on the third course of action (Violation of Section 10(b) of The Exchange Act and Rule 10b-5)**, judgment against all Defendants jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

    iii.    attorneys' fees and all costs; and

    iv.    such other and further relief as this Court may deem equitable and just.

**(d)** **on the fourth cause of action (Violation of Section 20(a) of The Exchange Act)**, judgment against the Individual Defendants, jointly and severally, for the following relief:

    i.    compensatory damages in an amount to be determined at trial;

    ii.    consequential damages in an amount to be determined at trial;

iii.     attorneys' fees and all costs; and

iv.     such other and further relief as this Court may deem equitable and just.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues in this action.

Dated:  August 13, 2019

Michael D. Cilento, Esq.
Zhenling Zhang, Esq.
Seiden Law Group LP
469 Seventh Ave., Fifth Floor
New York, New York 10018
mcilento@seidenlegal.com
(646) 766-1723
*Attorneys for Plaintiffs*

34