# Objection to the proposed settlement between the parties in the case 1:19-cv-02680-JMF

## SUMMARY

I would argue that the proposed settlement, though certainly better than status quo, is not sufficiently adequate and fair to be approved in its present state.

1. It is not **adequate**, because it cannot be expected to effectively prevent oppression of SIAF shareholders in the future.
2. It is not **fair**, because the proceeds will disproportionately benefit the plaintiffs, and not the corporation and all its shareholders.

I develop and support these claims further in the remainder of this text.

I would therefore appeal to the judge to instruct the parties to return to the drawing board and revise the terms of the settlement, focusing on achieving:

- stronger guarantees for real shareholder influence, proportional to the real ownership of the Company,
- certainty that the shareholder dilution will end, and
- a fairer distribution of the proceeds from the settlement.

In order to shield the majority shareholders from the very real risk for damage and losses while the settlement is being reworked, I would also appeal to the judge to order that, as temporary measures of protection:

1. the so-called supermajority shares ("Series A preferred stock") may not be voted for at any annual or special meeting of shareholders of the Corporation or action by written consent of shareholders,
2. the Company may not increase the number of shares,
3. nor enter into any agreements or take any decisions which could potentially lead to the increase to the number of shares,
4. nor issue shares to its staff, members of the board or any other third party as compensation, payment or corporate incitaments

until a revised settlement has been approved by the Court.

**FIRST CLAIM: LACK OF ADEQUACY – THE SETTLEMENT CANNOT BE EXPECTED TO EFFECTIVELY PREVENT OPPRESSION OF SIAF MAJORITY SHAREHOLDERS IN THE FUTURE.**

**1(a)   The proposed settlement doesn't address the fundamental problem of owner powerlessness**

As a background, it should be recalled that the majority shareholders have been harmed over the years by the repeated dilution of the common stock which, given the supermajority shares ("Series A preferred stock") held by the defendants, the majority shareholders can do nothing to protect themselves against.

The number of common shares have increased from 22.73 million at year-end 2016, less than four years ago($^1$) to currently 59.97 million($^2$). As stated in the updated complaint, points 60-61, 20.5 million shares were issued in 2018 only.

Thus, an owner of shares in the company at year-end 2016 has seen his/her ownership reduced by 62% in the last four years without being able to do anything about it.

As developed in the complaint, the issuing of new shares has been accompanied by a significant drop in the share price over time, further harming the owners.

It is clear that this is not a just a temporary measure to cover temporary liquidity problems. The company's management has systematically issued stock over the years and, at least at two occasions, performed reverse splits, which reduce the number of shares for existing shareholders.

It is also clear that the existence of the supermajority shares, which guarantee control over the Company to Defendant Lee independently of his level of ownership, is what makes this exploitation possible.

Against this background, it cannot be contested that the only part of the settlement which explicitly addresses these shares, point 9, is woefully inadequate, as it only foresees a conditional "exploration" of the possibilities to remedy the problem.

When compared to the solution sought by the lawsuit – the appointment of an independent receiver to assume full control over the Company, its assets, and employees – it is clear that the settlement does not fulfil the aims stated in the lawsuit, notably points 121-123.

**1(b)   A large part of the settlement is too unspecified to be relied upon, given the Company's track record.**

Turning to the remainder of the settlement, it must first be recalled that the Company has a very long history of issuing declarations of intent, sometimes even announcing decisions, which subsequently has failed to materialise.

---

($^1$)   10-K report for the financial year 2016, https://sec.report/Document/0001144204-17-015163, first page states a total number of 22.726.859 shares of common stock.

($^2$)    https://www.otcmarkets.com/stock/SIAF/security as available on the Internet on September 6, 2020 states a number of 59.967.166 outstanding shares.

The most serious example is the decision to provide a financial dividend of 5 cents per share in 2018, and 10 cent in 2019, which at the time was presented as definitive, but subsequently was retracted. Cf. Exhibit A.

Other examples are found in Exhibit B.

Given this history, the points 1-3, 5, 8 and 11 of the proposed settlement would need to be strengthened with details and deadlines. In their present state, they merely represent such declarations of intent that the Company has more often than not failed to implement in the past.

As an illustration and as shown in Exhibit C, points 3, 5 and 8 of the proposed settlement have already been the subject of such declarations of intent and therefore bring nothing new to the table.

**1(c)** **The parts of the settlement which allegedly provide significant shareholder influence and would impede future dilution are inadequate.**

Whereas the points 4, 6 and 7 together, at first sight, appear to provide some measure of protection, in that they give the plaintiff's representatives a place on the Board and a veto on further dilution, a careful reading of the text demonstrates that their position will be weak and that the measures will not provide sufficient protection.

First, the settlement guarantees places on the Board for the plaintiff's representatives only "*for as long as their services are productive for SIAF and benefit all shareholders, in the judgment of all of the parties to this settlement*". This means that the representatives can be dismissed unilaterally by Defendant Lee, possibly even within the stipulated first two years of service.

Moreover, the veto on new shares offers insufficient protection for the majority shareholders. As demonstrated in Exhibit C, management has at times entered into loan agreements through which the loan amount could be converted to common stock at very low rates, which potentially could massively dilute the majority shareholders. This risk is not mitigated by the existing settlement.

Finally, the representatives also risk becoming part in an existing conflict of interest, explained in point 2(b) below.

## SECOND CLAIM: LACK OF FAIRNESS - THE SETTLEMENT IS NOT FAIR, BECAUSE THE PROCEEDS WILL DISPROPORTIONATELY BENEFIT THE PLAINTIFFS, AND NOT THE CORPORATION AND ALL ITS SHAREHOLDERS.

**2(a) The settlement's benefits accrue disproportionately to the plaintiffs**

It would appear that the proceeds of the settlement as specified in point 11 disproportionately accrue to the plaintiffs, in particular given the conditional and provisional nature of the remaining commitments accepted by the Company.

It should be recalled that one Tri-Way share was valued to 3.41 USD through an independent appraisal at the moment of the carve-out([3]). Disregarding Tri-Way's subsequent profits and prudently considering this figure as fair value for one Tri-Way share, means that the plaintiffs will receive shares valued at the time to 4.2 million USD, to be compared with SIAF's total current market value of 18 million USD, and their stated expenses of some 220 thousand USD.

**2(b) The settlement risks extending an existing conflict of interest to the plaintiffs**

Defendant Lee is CEO of both SIAF and Tri-Way and (since the settlement foresees a transfer of 1.25 million shares of Tri-Way to the plaintiffs) an important shareholder in this latter company.

It is clear from information issued by the company that Tri-Way, at least since year-end 2017 owes more than 100 million dollars to SIAF and also is profitable:

> The annual 10-K report for the financial year 2017 lists the amounts due from Tri-Way to SIAF, as of December 31, 2017 as follows:
> - 59.3 million USD included in the post "interest in an unconsolidated equity investee"
> - 62.6 million USD included in the post "accounts receivables".
>
> The most recent quarterly 10-Q report, for the third quarter 2019, lists the amounts due from Tri-Way to SIAF, as of September 30, 2019 as follows:
> - 58.6 million USD included in the post "interest in an unconsolidated equity investee"
> - 49.1 million USD included in the post "accounts receivables".
>
> These amounts are interest-free.
>
> The most recent full-year annual report indicates that SIAF's share of Tri-Way's income (corresponding to its 36.6% ownership) amounted to 12.0 million USD in 2017 and 14.3 million in 2018. Tri-Way is thus consistently profitable.

However, instead of ensuring that at least part of the amounts due to SIAF would be paid by Tri-Way in order to alleviate SIAF's very severe cash-flow problems, SIAF's management has instead issued massive amounts of new shares during these years, mainly to pay its bills.

---

([3]) 10-K report for 2018, page 81.

Defendant Lee has thus provided Tri-Way with interest-free financing at the price of causing significant harm to SIAF's shareholders.

For this reason, it can be argued that the proposed compensation risks extending the present conflict of interest also to the plaintiffs, since their ownership in Tri-Way will be significant, possibly dwarfing the value of their ownership in SIAF.

By being awarded a considerable number of Tri-Way shares, the plaintiffs' situation will become more different from the other SIAF shareholders than if they had simply retained ownership in SIAF, thereby weakening their incitaments to act in the best interests of SIAF.

It should be recalled in this context that the plaintiffs will receive Tri-Way shares by virtue of their ownership in SIAF through the dividend process like any other shareholder, which in itself should act as an incitement to accelerate the process as much as possible.

**2(c)    The settlement gives disproportionate influence to the plaintiffs**

Not only will the plaintiffs get potentially several million dollars of worth of shares. The settlement also provides seats on the Board to the plaintiff's representatives regardless of the number of shares they will hold in the future; a privilege that other, possibly larger, shareholders will be unable to obtain, regardless of the size of their ownership in the company.

## ARGUMENTS IN SUPPORT OF A REVISED SETTLEMENT AND TEMPORARY PROTECTIVE MEASURES.

It is obvious that even the current terms of the settlement, insufficient as they are, would be better than the present situation; if the choice were between the present settlement and none at all, the settlement must be preferred as it implies at least a glimmer of hope.

However, as demonstrated above, the present settlement is lacking in important respects. I would therefore argue that the parties should be instructed to go back to the drawing board in order to search for a better solution, which provides stronger guarantees for real shareholder influence, proportional to the real ownership of the Company, certainty that the shareholder dilution will end, and a fairer distribution of the proceeds from the settlement.

This raises the issue of intermediary protection. As shown by the Exhibit D, there is very little to stop the current management from issuing large number of shares with short notice to the detriment of the majority owners.

The right to property is an essential and fundamental right. But in this particular case, it is clear that the rights of defendant Lee and other defendants to execute the rights arising from their possession of the supermajority shares has infringed unduly on the right of all other shareholders not to be arbitrarily deprived of their property.

**It therefore appears justified, in order to limit the risk for further harm of the kind which is enumerated above and in the complaint, to temporarily impose certain restrictions on the execution of said right, in a limited and precise manner.**

For this reason, I would also appeal to the Court to order that:

1. the votes of the so-called supermajority shares ("Series A preferred stock") may not be used to vote at any annual or special meeting of shareholders of the Corporation or action by written consent of shareholders,
2. the Company should not increase the number of shares,
3. nor enter into any agreements or take any decisions which could potentially lead to the increase to the number of shares,
4. nor issue shares to its staff, members of the board or any other third party as compensation, payment or corporate incitaments

until a revised settlement has been approved by the Court.

/s/ David Hallonsten

EXHIBIT A

Decision presented as definitive and subsequently retracted

# SIAF 10-Q report for the first quarter 2018, page 38:

**SIAF Cash Dividend Policy**

Under the advisement of its Board of Directors, the Company has decided to issue the following cash dividend for Fiscal Years 2018 and 2019:

- For year 2018: $0.05 / share to be declared and payable during Q4 2018, ex-dividend and payment dates to be determined.
- For year 2019: $0.05 / share will be declared and paid semiannually, ex-dividend and payment dates to be determined, for a total cash dividend distribution of $0.10 / share for the year, plus, in addition, five-percent (5%) of the amount exceeding the Company's annual net income of $20 million in FY2019 to be declared and paid as an additional cash dividend during the subsequent fiscal year (i.e. sometime during FY 2020).
- It is the Company's intention to carry-forward the cash dividend policy being implemented for FY2019 into its subsequent years of operation and will inform its investors as to its cash dividend policy for FY2020, FY2021, etc. as these years approach, accordingly.

EXHIBIT B

Forward-looking statements which have not yet been respected

# SIAF 10-Q report for the second quarter of 2018, page 31:

**Tri-way share distribution to SIAF shareholders**

As alluded to in our Form 10-Q for the period ended March 31, 2018, the Company has been in communication with Tri-way on a concept / plan that allows our common shareholders, eligible to receive dividend, to receive 18.3% cumulative ownership in Tri-way that does not impose a tax-liability to either company. The outline of the distribution plan will be made public by Tri-way in the next few weeks. Essentially, we believe that there will be two (2) scheduled distributions whereby, under each distribution, SIAF shareholders in exchange for Tri-way debt held by SIAF will receive convertible preferred shares of Tri-way in an amount equivalent to $3.41 per share value of one common share of Tri-way, the number of preferred shares to be received in book entry form to be based on the number of SIAF shares held by each eligible shareholder as at / on two (2) separate Record Dates, the dates of which shall be announced by Tri-way along with possibly their Conversion Dates announced, simultaneously.

# SIAF 10-K report for the financial year 2018, page 83:

- **Distribution of Tri-way shares to Our Shareholders has been delayed.**

As was reported in the 10-K 2017:

(a). The Company's intention to distribute 18.3% ownership of Tri-way Industries Ltd. to SIAF shareholders remains in effect and will be executed based on consideration of other items that need to be assessed and taken into consideration before its shares are available for transfer of ownership to SIAF shareholders. The main items having an impact on timing TRW share distribution are:

After consultation with our tax advisor it had been determined that a distribution of TRW shares to SIAF shareholders would incur a tax liability to the Company just shy of $10 million based on the distribution effectively constituting a dividend equivalent to one-half of the deemed gain on disposal that SIAF obtained at the time of TRW's carve-out from the Company. The new tax law passed this past December does not lessen the tax liability since the trigger (i.e. deemed gain on disposal) had occurred prior to the new tax law going into effect and would carry over to whatever distribution occurs going forward. The Company has been investigating an option that would allow it to distribute the debt-based ownership it has just acquired from TRW (i.e. 12.71% transferred to the Company in Q4 2017) to SIAF shareholders, essentially allowing each shareholder to receive ownership of the debt owed to SIAF and in exchange allow that debt to be converted into either cash and/or TRW when applicable, likely in the form of a warrant. By the transfer of debt, there is no tax liability on any of the gain incurred as compared to any portion of the 23.89% ownership being distributed, which holds a tax liability due to the value it received from the deemed gain on disposal. Although, transferring debt ownership only accounts for 12.71% of the 18.3% intended to be distributed, the Company is looking at a lesser tax burden in distributing the remaining 5.59% in TRW ownership, were the original distribution option exercised.

(2). In addition to the above, distribution timing of TRW shares has also been curtailed due to work that has been in progress within recent months on one of the Company's corporate exercise plans aiming to generate gains in share values to its shareholders. It is more beneficial to the shareholders if we shall wait a little longer until we shall firm up on said corporate exercise plan before we shall distribute said 18.3% Tri-way shares to its shareholders.

(3). The Company aims to honor its commitment of having a portion or all the intended 18.3% ownership in TRW distributed to SIAF shareholders during 2019 prior to the finalization of said corporate exercise plan upon its clearance without further comments from SEC.

(my highlight)

# SIAF 10-K report for the financial year 2018, page 84:

- The immediate activities and directions of the Company

At this juncture for SIAF is the same as for Tri-way is to concentrate and to work side by side with Tri-way to generate the funding needed and to reduce capital expenditure spending, carefully nurture all W/C to sustain sales turn overs, restructure of all agriculture assets into more commercially bankable assets thus when funds are available we shall take on the following priorities within 2019:

* A well manage and organized Buy-Back Program

* Restructuring of debts and debt repayment program

* Expansion program on the Trading activities of SIAF

* Move forward on CA's Malaysian and Indian Projects.

* Recruiting of the corporate management and corporate operation teams.

* Restructuring of agriculture assets into more bankable assets.

* Programing of a revitalized plan for SJAP.

* Accelerating the studies on merger and/or JV plans for JHST, HSA and MEIJI.

Comment: judged from the information provided publicly to SIAF's shareholders, none of these actions appear so far to have made any progress.

# Press release issued by SIAF on July 14, 2020:

## News and Press Releases

### Sino Agro Food Announces Filing Schedule and OTC Listing Implications

Jul 14, 2020

Sino Agro Food, Inc. ("SIAF" or "The Company") previously announced a delay in filing its 2019 Form 10-K Annual Report (the "Report") due to COVID-19. Travel restrictions between China and Hong Kong have continued. Therefore, it is not possible for the Company to meet audited filing deadlines needed to maintain its OTCQX standing. The Company will drop to OTCQB effective July 16, 2020 and to the pink sheets August 1, 2020.

It is impossible to predict when the traveling restrictions will be lifted. However, once restrictions are relaxed, the Company expects to complete its 10-K filing within three to four weeks, and its 10-Q quarterly filings within another two weeks each. As a contingency, the SIAF is exploring options to change to a China based auditor for these filings. Once the reports are filed, OTCQB and OTCQX trading status will be reinstated.

The Company will post an update on operations within a week. While COVID-19 has had a significant deleterious effect on production, substantial progress has been made toward transitioning the trading business into the Company's main short and intermediate term cash flow driver.

Comment: no such update has so far been posted.

---

# Press release issued by SIAF on the Q1 2018 results on May 21, 2018:

The Company has adopted austere measures to reduce its dependence on equity funding by approaching it as the exception rather than the rule when it comes to determining which modes of operation are necessary to maintain the Company's outlook over the next two years.

Comment: after the adoption of the austere measures to reduce its dependence on equity funding, the share count has increased from then 37.6 million shares to todays 59.967 million

EXHIBIT C

Example: agreements potentially reducing the ownership of the company's existing owners significantly, if executed

# SIAF 10-Q report for the first quarter 2018, point 22:

## 22. CONVERTIBLE NOTE PAYABLES

On August 29, 2014, the Company completed the closing of a private placement financing transaction with an accredited investor, which purchased a 10.5% Convertible Note (the " **Note 1** ") in the aggregate principal amount of up to $33,300,000. The Company received the total advance of $11,632,450. The Company shall offer investor a discount equal to 25% of the amount of the principal advanced by the investor.

Interest on the note shall accrue on the outstanding principal balance of this Note from August 29, 2014. Interest shall be payable quarterly on the last day of each of March, June, September and December commencing September 30, 2014 provided, however, that note holder may elect to require the Company to issue to the note holder a promissory note in lieu of cash in satisfaction of any interest due and payable at such time. Any interest payment note shall be subject to the same terms as the note. The note has a maturity date of February 28, 2020.

The note is convertible, at the discretion of the note holder, into shares of the Company's common stock (i) at any time following an Event of Default, or (ii) for a period of thirty (30) calendar days following October 31, 2015 and each anniversary thereof, at an initial conversion price per share of $1.00, (price prior to reversed split) subject to adjustment for stock splits, reverse stock splits, stock dividends and other similar transactions and subject to the terms of the note. As long as the note is outstanding, the investor shall have a right of first refusal, exercisable for thirty (30) calendar days after notice to the note holder, to purchase securities proposed to be offered and sold by the Company.

The Company and the note holder entered into a restructuring agreement regarding the settlement of the Note 1. Both parties have agreed to restructure the indebtedness represented by Note 1 as follows: (a) SIAF issues 5,196,333 shares of its common stock and transfer 400,000 shares of TRW to the note holder; and (b) SIAF executes a new promissory note in the principal amount of $15,589,000 to the note holder to be paid in installments over a period of time. However, both parties remain open to negotiate an all-cash settlement of the Note 1.

As a result, the amount outstanding under Note 1 was reclassified as other payables - straight note payable of $29,367,999 (see Note 19).

On October 20, 2017, the Company issued another Convertible Note (the **"Note 2"**) with a principal amount of $4,000,000 due on February 28, 2018. The note holder had the option to convert all or any part of the outstanding note into the common stock of the Company (the "Primary Optional Conversion") or TRW (the "Secondary Optional Conversion") at any time for a period of eight months from the note's maturity date. The conversion price for Primary Optional Conversion is lesser of $1.5 per share or at 65% of the market share price of the Company. While the conversion price for Secondary Optional Conversion is $3.41 per share subject to equitable adjustment for stock split, stock dividend or right offerings.

Under the agreement, the Company shall pay the note holder 120,000 common shares of SIAF or 32,000 common shares of TRW as an origination fee. The note bears a flat interest payment which shall be settled by 200,000 common shares of SIAF or 55,000 common shares of TRW. As of March 31, 2018, no settlement for both origination fee and interest payment. The supplemental agreement to the Bond Subscription Agreement with the Subscriber to extend the Bond Issue by a year to February 28, 2019 was in progress up to the reporting date. All other terms and conditions of the Bond Subscription Agreement and the Conditions continue in full force and effect.

*(my highlight)*

Comment: As the stock price on October 26, 2018 (the last business day in the 8-month period after the note's maturity date) closed at 38 cents, the execution of the Primary Optional Conversion at that date would have given rise to an increase to the number of shares of 4.000.000 / (38 * 65%) or 16.2 million shares, to be compared to the then total number of common shares (49.25 million); thus a dilution of 25%.

A lower stock price would potentially have diluted the existing shareholders even further.

Thus, in order to obtain a loan of 4 MUSD – less than 1% of book value – SIAF's management was prepared to dilute the majority shareholders by a very significant percentage, with no fixed upper limit to the dilution.

EXHIBIT D

Example: insufficiently explained increase of share count

# Excerpt from the Company's Q3 Q&A of December 17th 2019:



> **The Company recently raised its authorized share count and issued new shares, the first newly issued shares since its commitment to hold the share count. Please explain.**
>
> **The actions are in the best interest of the Company. Details, analysis, and implications will be addressed in an upcoming posting as soon as plausible.**

Comment: the Company had then recently increased its share count from 50 to 60 million shares. The promised "*details, analysis and implications*" were provided in a press release of April 1st (sic!) 2020, as follows:

## Recent Developments

**Share Count**

The Company recently increased its outstanding share count to 60M shares. This was done in large part to accommodate an offering of preferred equity shares. As envisioned, a provision in this offering would allow an exchange of common shares for preferred shares. If fully exercised, there must still remain an adequate number of outstanding common shares.

The preferred offering initiative is progressing well through the SEC process.

Comment: The press release appears to claim that the additional 10M shares were issued in order to ensure that enough common stock would remain outstanding, once the exchange offering (new preferred shares for old common stock[4]) had taken place. The fear would thus be that the offering would be so popular that a too low number of common stock shares would remain afterwards.

Assuming that the offering would be considered so attractive that it would be executed in full (which itself is debatable), it should be recalled that the share price at the time was 24 cent. A full uptake of the offer would hence result in a reduction of more than 112M shares of common stock, more than twice the number of outstanding shares at the time. Incidentally, given the current stock price, the offering today would allow a reduction of more than 200M shares.

10M additional shares would make no difference at all in that respect. Besides, the Company could easily have issued a suitable number of extra common shares, if really necessary, once they knew what the uptake would be. The question thus remains why 10 million shares had to be issued very quickly at that time.

Moreover, the 2019 Q3 Q&A indicated that an explanation would be provided "*as soon as plausible*". But the explanation finally published on April 1st could equally well have been stated immediately in the Q&A and it is not clear why this wasn't done.

The explanations provided by the Company thus leave important questions unanswered.

---

[4] https://news.cision.com/sino-agro-food/r/sino-agro-food--inc--files-to-offer-new-preferred-shares,c2852599