UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARNE H. FREDLY, HENG REN SILK ROAD INVESTMENTS LLC, HENG REN INVESTMENTS LP, derivatively on behalf of SINO AGRO FOOD, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SINO AGRO FOOD, INC., LEE YIP KUN SOLOMON, TAN POAY TEIK, CHEN BOR HANN, LIM CHANG SOH., <br><br> Defendants, <br><br> and <br><br> SINO AGRO FOOD, INC., <br><br> Nominal Defendant | Case No. 19-cv-02680 (JMF) <br><br> **REPLY IN SUPPORT OF MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND IN RESPONSE TO THE OBJECTION (ECF NOS. 104 AND 105)** |

Plaintiffs respectfully submit this reply in further support of their Motion for Final Approval of the Proposed Settlement (the "Motion"). ECF No. 100.

## I. The Lone Objection To The Proposed Settlement Is Not Well Founded

Any objections to the Settlement not filed with the Court and served on the Parties by September 29, 2020, are deemed waived. *See* ECF No. 98 (Preliminary Approval Order) ¶ 8. As of September 29, 2020, counsel has not received any e-mailed objections, and only one objection has been lodged with the Court. ECF No. 105 (the "Objection"). As set forth below, the Objection fundamentally misunderstands Sino Agro Food's ("SIAF" or the "Company") present state and the predicament facing its shareholders.

### a. SIAF's Recent History

As the Motion elucidated, the Company is experiencing serious cashflow problems, and its "crown jewel" subsidiary appears to be on the verge of losing much of its China-based assets to landlords suing for back rent in a Chinese court. Motion, at 3-4.

The history leading up to this latest, grim development is well known. SIAF first announced that it had begun stocking an inland aquaculture "megafarm" near the city of Zhongshan in February 2016. Ex. 1. In June 2016, the Company stated that the megafarm would produce 10,000 tons of highly prized freshwater shrimp, rising to 70,000 tons by 2020. Ex. 2.

However, over a year later in late 2017, industry publication *Undercurrent News* reported after a site visit that the "megafarm" was two years behind schedule and had not harvested any shrimp at all. *Id*. Throughout this time, as set forth in prior briefing, SIAF was issuing shares as collateral to lenders. *See e.g.* ECF No. 90 (Prelim. Approval Motion), 4-6 (showing that the first collateralized shares were issued in January 2016, and the steady decline in the stock price that followed).

As of November 2018, Heng Ren's pre-suit on the ground diligence of the megafarms showed shuttered offices and commercial activity at a stand-still. *See* ECF No. 91 ("First Halesworth Declaration") ¶¶ 10-11. Nevertheless, management continued to tout the farm's promise as late as May 2019. *See* ECF No. 100-7 (Motion Exhibit E), at 5 (stating that "revitalization of aquafarms four and five is underway. We've had good results in trial runs of Pacific White prawns, and will employ the new methods … within the mega farm.")

Two years on from Heng Ren's investment, the Company's original, grandiose promises have amounted to nothing. Indeed, as the *Undercurrent News* reported on September 23, 2020, management made "big promises", including for example, that the megafarm would eventually produce more shrimp than the entire annual production of Thailand, has utterly failed to deliver. Ex. 3. As the article noted, "the decrepit state of Sino Agro's business was in stark contrast to the firm's sky-high valuation of its Chinese assets and sales." *Id.*

In short, despite the inflated hopes that many investors—including the Plaintiffs—bought into, Tri-way was dead in the water by late 2017 and has not recovered.

### b. The Objection Makes Fundamentally Erroneous Assumptions

Ignoring the above realities, the Objection simply adopts the Company's financials wholesale and bases all its demands on them. For example, taking at face value a self-serving 2017 "independent appraisal"[1] that SIAF made of Tri-way and accepting without question that Tri-way has been "consistently profitable" for the past three years, the Objection assumes that Tri-way is worth hundreds of millions. Objection, at 4.

As Plaintiffs have previously explained, whatever value SIAF arbitrarily assigned to Tri-way three years ago, when it was intent on propping up its share price to obtain share-collateralized

---

[1] The appraisal allowed SIAF to take a "one-time (deemed) gain of USD 56.9 million" on its financials. *See* ECF No. 100-5 (Motion Exhibit C), at 81.

loans, that is not Tri-way's value now. *See e.g.* Prelim. Approval Motion, at 19-20; Motion, at 6-8 (explaining that using SIAF's market value as proxy, and assuming Tri-way's shares were liquid, the shares Plaintiffs are asking approval for would be worth no more than $132,500 as of July 2020). Any sober valuation would also have to take into account that Tri-way's shares cannot be sold, as well as the fact that turning Tri-way around *and* getting it listed on a stock exchange are both highly uncertain and will take time. Motion, at 8. The uncertainty over Tri-way's future is only exacerbated by the recently discovered fact that it is delinquent on rent and is facing litigation from its landlord and a court-ordered seizure of its assets in China. *Id*. at 4.

The Objection makes no attempt to accounts for these facts in analyzing Tri-way's value. Instead, it parrots SIAF's out-of-date and self-serving financials and simply accepts that Tri-way's shares are somehow worth $3.41 apiece—even though the market valued its parent company at $0.08 per share a mere two months ago. *See* Objection, at 4. Illustrating this tunnel vision, it assumes a wildly optimistic view of Tri-way's business in asking the Court to repudiate the entire settlement, but does not once acknowledge the fact that Tri-way cannot even pay rent. Nor does the objector seem to recognize that since the last set of rosy financials cited in the Objection (*id.*), the Company has been unable to even file its 2019 annual report.[2] Having consequently been demoted to the Pink Sheets, SIAF has effectively "gone dark," and is no longer even maintaining the pretense of being a successful business.

The Objection appears to understand none of this. Instead, it pretends that SIAF's latest set of financials, which are over a year old, are: (i) 100% reliable; and (ii) carries forward into today as if nothing has happened in the interim. But as the Heng Ren-commissioned August 2019 forensic analysis of SIAF's accounting showed, the Company's published financials and asset

---

[2] No audited financial statements have been filed with the SEC since the Form 10-K 2018 annual report filed more than 17 months ago on 4/15/2019. The last unaudited financials were as of Third Quarter 2019.

valuations were far from reliable. First Halesworth Decl. ¶ 21; ECF No. 91-2 (Ex. B to First Halesworth Decl.). Of course, even as the Objection swallows wholesale the idea that Tri-way was "consistently profitable", it simultaneously recognizes that Tri-way owes tens of millions in unpaid receivables to SIAF. Objection, at 4. But, instead of recognizing the obvious: that Tri-way is out of money, it proceeds to opine that Plaintiffs could have somehow forced Tri-way to pay millions in settlement. *Id.*; *cf.* Exs. 2-3. In short, the Objection's assumptions are untethered to reality.

###   c. The Objection Makes Unrealistic Demands

Separate and apart from the host of erroneous assumptions it makes about the Company's business and current state, the Objection also makes a series of demands that appears also to be premised on a fundamental misunderstanding of the nature and cost of litigation, as well as the very purpose of the Settlement.

For example, the Objection asks for "guarantees" that shareholders may vote "proportional to the real ownership of the company." Objection, at 1. This demand ignores the fact that Solomon Lee holds supermajority voting A-shares, which is not prohibited by law, and which Plaintiffs could have forcibly overcome only by litigating to judgment or obtaining a receivership. *See* Third Halesworth Decl. ¶¶ 3-8. Here, the Plaintiffs have obtained a written concession that Lee will consider alienating or retiring the A-shares and will attempt to persuade him to do so from within the Company. *Id.* In contrast, the Objection proposes no path to its demand for "guarantees."

The Objector then cites the Company's less than stellar history of promise-making as somehow compromising the integrity of the settlement. Objection, at 3. This is circular logic. The Settlement is not an empty, one-sided promise. Plaintiffs are personally undertaking to join the board of directors. Indeed, the very purpose of installing independent directors and a CFO, tightening disclosure practices, and instituting stronger corporate governance is to *prevent* a repetition of the Company's prior misconduct. The Objection misses this point entirely.

As to the independent directorships, the Proposed Settlement provides for the independent directors to serve "for as long as their services are productive for SIAF and benefit all shareholders, in the judgment of all of the parties to this settlement." Objection, at 3. The Objection interprets this to mean "that the representatives can be dismissed unilaterally by Defendant Lee." *Id.* This reading ignores the next clause, which makes it clear that the director appointees are to serve for a minimum of two years with an option to renew. ECF No. 91-1 (Proposed Settlement), at 3. The proper reading of the settlement is that the independent directors are to serve ***unless*** all parties agree their services are no longer needed—not the reverse.

The Objection then questions the power of the independent directors' veto, citing the fact that "management has at times entered into loan agreements through which the loan amount could be converted into common stock at very low rates." Objection, at 3. This critique makes no sense. A veto is a veto, no new shares will be created, through conversion or any other means, over the veto of the new directors. Indeed, if the objector had read the voluminous approval filings before the Court, it would have been clear that ending the use of Company shares in obtaining loans was one of the core aims of the litigation and a non-negotiable *pre-condition* to Settlement.

Finally, the Objector speculates that Plaintiffs receiving Tri-way shares will somehow create a "conflict of interest". Objection, at 5. According to the Objection: "[b]y being awarded a considerable number of Tri-Way shares, the plaintiffs' situation will become more different from the other SIAF shareholders than if they had simply retained ownership in SIAF, thereby weakening their incitements to act in the best interests of SIAF." *Id.* This reverse-logic defies common sense. The only way in which additional Tri-way shares differentiates Plaintiffs from other shareholders is by ***strengthening their incentives*** to improve Tri-way—which would directly benefit SIAF as a 36.6% owner—not the other way around.

Summing up all of its demands, the Objection asks that the Court order the parties "go back to the drawing board." *Id.* But it makes no proposal on how. Indeed, it appears that other than the Proposed Settlement objected to and the Company's own filings, the Objector has not digested any of the materials submitted before the Court. Of course, the Objector did not contribute anything to the Settlement results that he denigrates, nor does he intend to contribute to the expenses of resumed litigation—which would add nothing to the future of the Company. *See* Third Halesworth Decl. ¶¶ 8-13.  In sum, even if its assumptions were valid—which they are not—the Objection's demand to scrap the settlement and "go back to the drawing board" are not realistic.

Against the lone Objector's basic lack of awareness concerning the Company's situation, "a strong presumption of fairness attaches" to settlements negotiated at arm's-length by experienced and well-informed litigants. *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116 (2nd Cir. 2005) ("presumption of fairness, adequacy, and reasonableness may attach to a … settlement reached in arm's-length negotiations between experienced, capable counsel"); *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts"); *In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd D''Amato v. Deutsche Bank,* 236 F.3d 78 (2d Cir. 2001) (settlement that "is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation … will enjoy a presumption of fairness").

Here, the Proposed Settlement was negotiated by experienced investors who had been closely scrutinizing SIAF and advocating against management for years. The Court should give deference to their knowledge and experience in considering the fairness of the settlement. As even

the sole Objection stated, "if the choice were between the present settlement and none at all, the settlement must be preferred as it implies at least a glimmer of hope." Objection, at 5. Indeed, one of the first things Plaintiffs intend to do is to instill discipline in the Company's financial disclosures and press releases, which would fundamentally resolve the Objection's complaints concerning the various exhibits it attached: that the Company's disclosures lack transparency and makes promises it does not keep.

## II. Response From Shareholders Supports Approving The Settlement

The single, meritless objection notwithstanding, the support from SIAF shareholders, both explicit and implicit, weighs heavily in favor of approval of the Settlement. Here, the lone Objector represents approximately 0.9% of SIAF's outstanding shares.[3] Against his unfounded demands, a far larger proportion of the Company's shareholder base have voiced their support for the Settlement. Motion, at 5 (noting that Brent Rogers, who spoke for more than 10% of the Company's shareholders, voiced his and his group of investors' support for the settlement).

Since the Motion, the parties have received an additional message of support from Mr. Rogers for the proposed settlement. Ex. 4. Such positive indications support approval. *See Strougo v. Bassinni*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("It has repeatedly been held that 'one indication of the fairness of a settlement is the lack of or small number of object[ors].'"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (three objections out of tens of thousands of shareholders "raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members").

Finally, the Company's share price provides the most objective indicium of investors' views of the Settlement. Since the filing of the Preliminary Approval motion, SIAF's shares, which

---

[3] *See* Motion, at fn. 1 (noting that SIAF has approximately 49.8 million in outstanding shares).

had traded at around $0.08/share for most of 2020, has more than *tripled* in price since the July 15, 2020 filing of the Preliminary Approval Motion and now trades at approximately $0.28/share. As the below stock chart makes clear, the market conclusively views the Proposed Settlement as a positive step for the Company.



### III.   Conclusion

For the foregoing reasons, the Proposed Settlement is the best path forward, it should be approved.

Respectfully Submitted,

Dated: October 6, 2020                                                       **AFN LAW PLLC**

                                                                             By: _____

                                                                             Angus F. Ni
                                                                             41 Madison Ave, 31st Floor,

New York, NY 10010
(646) 453-7294
angus@afnlegal.com

*Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2020, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Richard Babnick RBabnick@SRF.LAW

*Attorney for Defendants*

By:    /s/ *Angus F. Ni*
Angus F. Ni